(Slip Opinion)             OCTOBER TERM, 2018                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW PRIME INC. *v.* OLIVEIRA

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 17–340.   Argued October 3, 2018—Decided January 15, 2019

Petitioner New Prime Inc. is an interstate trucking company, and respondent Dominic Oliveira is one of its drivers. Mr. Oliveira works under an operating agreement that calls him an independent contractor and contains a mandatory arbitration provision. When Mr. Oliveira filed a class action alleging that New Prime denies its drivers lawful wages, New Prime asked the court to invoke its statutory authority under the Federal Arbitration Act to compel arbitration. Mr. Oliveira countered that the court lacked authority because §1 of the Act excepts from coverage disputes involving "contracts of employment" of certain transportation workers. New Prime insisted that any question regarding §1's applicability belonged to the arbitrator alone to resolve, or, assuming the court could address the question, that "contracts of employment" referred only to contracts that establish an employer-employee relationship and not to contracts with independent contractors. The District Court and First Circuit agreed with Mr. Oliveira.

*Held*:

  1. A court should determine whether a §1 exclusion applies before ordering arbitration. A court's authority to compel arbitration under the Act does not extend to all private contracts, no matter how emphatically they may express a preference for arbitration. Instead, antecedent statutory provisions limit the scope of a court's §§3 and 4 powers to stay litigation and compel arbitration "accord[ing to] the terms" of the parties' agreement. Section 2 provides that the Act applies only when the agreement is set forth as "a written provision in any maritime transaction or a contract evidencing a transaction involving commerce." And §1 helps define §2's terms, warning, as relevant here, that "nothing" in the Act "shall apply" to "contracts of em-

ployment of seamen, railroad employees, or any other class of work-
ers engaged in foreign or interstate commerce." For a court to invoke
its statutory authority under §§3 and 4, it must first know if the par-
ties' agreement is excluded from the Act's coverage by the terms of
§§1 and 2. This sequencing is significant. See, *e.g.*, *Bernhardt* v. *Pol-
ygraphic Co. of America*, 350 U. S. 198, 201–202. New Prime notes
that the parties' contract contains a "delegation clause," giving the
arbitrator authority to decide threshold questions of arbitrability,
and that the "severability principle" requires that both sides take all
their disputes to arbitration. But a delegation clause is merely a spe-
cialized type of arbitration agreement and is enforceable under §§3
and 4 only if it appears in a contract consistent with §2 that does not
trigger §1's exception. And, the Act's severability principle applies
only if the parties' arbitration agreement appears in a contract that
falls within the field §§1 and 2 describe. Pp. 3–6.

2. Because the Act's term "contract of employment" refers to any
agreement to perform work, Mr. Oliveira's agreement with New
Prime falls within §1's exception. Pp. 6–15.

(a) "[I]t's a 'fundamental canon of statutory construction' that
words generally should be 'interpreted as taking their ordinary . . .
meaning . . . at the time Congress enacted the statute.' " *Wisconsin
Central Ltd.* v. *United States*, 585 U. S. ___, ___ (quoting *Perrin* v.
*United States*, 444 U. S. 37, 42). After all, if judges could freely in-
vest old statutory terms with new meanings, this Court would risk
amending legislation outside the "single, finely wrought and exhaust-
ively considered, procedure" the Constitution commands. *INS* v.
*Chadha*, 462 U. S. 919, 951. The Court would risk, too, upsetting re-
liance interests by subjecting people today to different rules than
they enjoyed when the statute was passed. At the time of the Act's
adoption in 1925, the phrase "contract of employment" was not a
term of art, and dictionaries tended to treat "employment" more or
less as a synonym for "work." Contemporaneous legal authorities
provide no evidence that a "contract of employment" necessarily sig-
naled a formal employer-employee relationship. Evidence that Con-
gress used the term "contracts of employment" broadly can be found
in its choice of the neighboring term "workers," a term that easily
embraces independent contractors. Pp. 6–10.

(b) New Prime argues that by 1925, the words "employee" and
"independent contractor" had already assumed distinct meanings.
But while the words "employee" and "employment" may share a
common root and intertwined history, they also developed at different
times and in at least some different ways. The evidence remains
that, as dominantly understood in 1925, a "contract of employment"
did not necessarily imply the existence of an employer-employee rela-

Cite as: 586 U. S. ____ (2019)                3

Syllabus

tionship. New Prime's argument that early 20th-century courts
sometimes used the phrase "contracts of employment" to describe
what are recognized today as agreements between employers and
employees does nothing to negate the possibility that the term also
embraced agreements by independent contractors to perform work.
And its effort to explain away the statute's suggestive use of the term
"worker" by noting that the neighboring terms "seamen" and "rail-
road employees" included only employees in 1925 rests on a precari-
ous premise. The evidence suggests that even "seamen" and "railroad
employees" could be independent contractors at the time the Arbitra-
tion Act passed. Left to appeal to the Act's policy, New Prime sug-
gests that this Court order arbitration to abide Congress' effort to
counteract judicial hostility to arbitration and establish a favorable
federal policy toward arbitration agreements. Courts, however, are
not free to pave over bumpy statutory texts in the name of more ex-
peditiously advancing a policy goal. Rather, the Court should respect
"the limits up to which Congress was prepared" to go when adopting
the Arbitration Act. *United States* v. *Sisson*, 399 U. S. 267, 298. This
Court also declines to address New Prime's suggestion that it order
arbitration anyway under its inherent authority to stay litigation in
favor of an alternative dispute resolution mechanism of the parties'
choosing. Pp. 10–15.

857 F. 3d 7, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which all other
Members joined, except KAVANAUGH, J., who took no part in the consid-
eration or decision of the case. GINSBURG, J., filed a concurring opinion.

Cite as: 586 U. S. ____ (2019)     1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–340

_____

## NEW PRIME INC., PETITIONER *v.* DOMINIC OLIVEIRA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[January 15, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

The Federal Arbitration Act requires courts to enforce private arbitration agreements. But like most laws, this one bears its qualifications. Among other things, §1 says that "nothing herein" may be used to compel arbitration in disputes involving the "contracts of employment" of certain transportation workers. 9 U. S. C. §1. And that qualification has sparked these questions: When a contract delegates questions of arbitrability to an arbitrator, must a court leave disputes over the application of §1's exception for the arbitrator to resolve? And does the term "contracts of employment" refer only to contracts between employers and employees, or does it also reach contracts with independent contractors? Because courts across the country have disagreed on the answers to these questions, we took this case to resolve them.

I

New Prime is an interstate trucking company and Dominic Oliveira works as one of its drivers. But, at least on paper, Mr. Oliveira isn't an employee; the parties' contracts label him an independent contractor. Those agree-

Opinion of the Court

ments also instruct that any disputes arising out of the parties' relationship should be resolved by an arbitrator—even disputes over the scope of the arbitrator's authority.

Eventually, of course, a dispute did arise. In a class action lawsuit in federal court, Mr. Oliveira argued that New Prime denies its drivers lawful wages. The company may call its drivers independent contractors. But, Mr. Oliveira alleged, in reality New Prime treats them as employees and fails to pay the statutorily due minimum wage. In response to Mr. Oliveira's complaint, New Prime asked the court to invoke its statutory authority under the Act and compel arbitration according to the terms found in the parties' agreements.

That request led to more than a little litigation of its own. Even when the parties' contracts mandate arbitration, Mr. Oliveira observed, the Act doesn't *always* authorize a court to enter an order compelling it. In particular, §1 carves out from the Act's coverage "contracts of employment of . . . workers engaged in foreign or interstate commerce." And at least for purposes of this collateral dispute, Mr. Oliveira submitted, it doesn't matter whether you view him as an employee or independent contractor. Either way, his agreement to drive trucks for New Prime qualifies as a "contract[] of employment of . . . [a] worker[] engaged in . . . interstate commerce." Accordingly, Mr. Oliveira argued, the Act supplied the district court with no authority to compel arbitration in this case.

Naturally, New Prime disagreed. Given the extraordinary breadth of the parties' arbitration agreement, the company insisted that any question about §1's application belonged for the arbitrator alone to resolve. Alternatively and assuming a court could address the question, New Prime contended that the term "contracts of employment" refers only to contracts that establish an employer-employee relationship. And because Mr. Oliveira is, in fact as well as form, an independent contractor, the company argued, §1's exception doesn't apply; the rest of the

Opinion of the Court

statute does; and the district court was (once again) required to order arbitration.

Ultimately, the district court and the First Circuit sided with Mr. Oliveira. 857 F. 3d 7 (2017). The court of appeals held, first, that in disputes like this a court should resolve whether the parties' contract falls within the Act's ambit or §1's exclusion before invoking the statute's authority to order arbitration. Second, the court of appeals held that §1's exclusion of certain "contracts of employment" removes from the Act's coverage not only employer-employee contracts but also contracts involving independent contractors. So under any account of the parties' agreement in this case, the court held, it lacked authority under the Act to order arbitration.

## II

In approaching the first question for ourselves, one thing becomes clear immediately. While a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional. If two parties agree to arbitrate future disputes between them and one side later seeks to evade the deal, §§3 and 4 of the Act often require a court to stay litigation and compel arbitration "accord[ing to] the terms" of the parties' agreement. But this authority doesn't extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration.

Instead, antecedent statutory provisions limit the scope of the court's powers under §§3 and 4. Section 2 provides that the Act applies only when the parties' agreement to arbitrate is set forth as a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce." And §1 helps define §2's terms. Most relevant for our purposes, §1 warns that "nothing" in the Act "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers

engaged in foreign or interstate commerce." Why this very particular qualification? By the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers. And it seems Congress "did not wish to unsettle" those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate. *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 121 (2001).

Given the statute's terms and sequencing, we agree with the First Circuit that a court should decide for itself whether §1's "contracts of employment" exclusion applies before ordering arbitration. After all, to invoke its statutory powers under §§3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§1 and 2. The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum.

Nothing in our holding on this score should come as a surprise. We've long stressed the significance of the statute's sequencing. In *Bernhardt* v. *Polygraphic Co. of America*, 350 U. S. 198, 201–202 (1956), we recognized that "Sections 1, 2, and 3 [and 4] are integral parts of a whole. . . . [Sections] 1 and 2 define the field in which Congress was legislating," and §§3 and 4 apply only to contracts covered by those provisions. In *Circuit City*, we acknowledged that "Section 1 exempts from the [Act] . . . contracts of employment of transportation workers." 532 U. S., at 119. And in *Southland Corp.* v. *Keating*, 465 U. S. 1, 10–11, and n. 5 (1984), we noted that "the enforceability of arbitration provisions" under §§3 and 4 depends on whether those provisions are "part of a written maritime contract or a contract 'evidencing a transaction in-

volving commerce'" under §2—which, in turn, depends on the application of §1's exception for certain "contracts of employment."

To be sure, New Prime resists this straightforward understanding.  The company argues that an arbitrator should resolve any dispute over §1's application because of the "delegation clause" in the parties' contract and what is sometimes called the "severability principle."  A delegation clause gives an arbitrator authority to decide even the initial question whether the parties' dispute is subject to arbitration.  *Rent-A-Center*, *West*, *Inc.* v. *Jackson*, 561 U. S. 63, 68–69 (2010).  And under the severability principle, we treat a challenge to the validity of an arbitration agreement (or a delegation clause) separately from a challenge to the validity of the entire contract in which it appears.  *Id.*, at 70–71.  Unless a party specifically challenges the validity of the agreement to arbitrate, both sides may be required to take all their disputes—including disputes about the validity of their broader contract—to arbitration.  *Ibid.*  Applying these principles to this case, New Prime notes that Mr. Oliveira has not specifically challenged the parties' delegation clause and submits that any controversy should therefore proceed only and immediately before an arbitrator.

But all this overlooks the necessarily antecedent statutory inquiry we've just discussed.  A delegation clause is merely a specialized type of arbitration agreement, and the Act "operates on this additional arbitration agreement just as it does on any other."  *Id.*, at 70.  So a court may use §§3 and 4 to enforce a delegation clause only if the clause appears in a "written provision in . . . a contract evidencing a transaction involving commerce" consistent with §2.  And only if the contract in which the clause appears doesn't trigger §1's "contracts of employment" exception.  In exactly the same way, the Act's severability principle applies only if the parties' arbitration agreement

appears in a contract that falls within the field §§1 and 2 describe.  We acknowledged as much some time ago, explaining that, before invoking the severability principle, a court should "determine[] that the contract in question is within the coverage of the Arbitration Act."  *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395, 402 (1967).

### III

That takes us to the second question: Did the First Circuit correctly resolve the merits of the §1 challenge in this case?  Recall that §1 excludes from the Act's compass "contracts of employment of . . . workers engaged in . . . interstate commerce."  Happily, everyone before us agrees that Mr. Oliveira qualifies as a "worker[] engaged in . . . interstate commerce."  For purposes of this appeal, too, Mr. Oliveira is willing to assume (but not grant) that his contracts with New Prime establish only an independent contractor relationship.

With that, the disputed question comes into clear view: What does the term "contracts of employment" mean?  If it refers only to contracts that reflect an employer-employee relationship, then §1's exception is irrelevant and a court is free to order arbitration, just as New Prime urges.  But if the term *also* encompasses contracts that require an independent contractor to perform work, then the exception takes hold and a court lacks authority under the Act to order arbitration, exactly as Mr. Oliveira argues.

### A

In taking up this question, we bear an important caution in mind.  "[I]t's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'"  *Wisconsin Central Ltd.* v. *United States*, 585 U. S. ___, ___ (2018) (slip op., at 9)

Opinion of the Court

(quoting *Perrin* v. *United States*, 444 U. S. 37, 42 (1979)).
See also *Sandifer* v. *United States Steel Corp.*, 571 U. S.
220, 227 (2014).  After all, if judges could freely invest old
statutory terms with new meanings, we would risk
amending legislation outside the "single, finely wrought
and exhaustively considered, procedure" the Constitution
commands.  *INS* v. *Chadha*, 462 U. S. 919, 951 (1983).  We
would risk, too, upsetting reliance interests in the settled
meaning of a statute.  Cf. 2B N. Singer & J. Singer, Suth-
erland on Statutes and Statutory Construction §56A:3
(rev. 7th ed. 2012).  Of course, statutes may sometimes
refer to an external source of law and fairly warn readers
that they must abide that external source of law, later
amendments and modifications included.  *Id.*, §51:8 (dis-
cussing the reference canon).  But nothing like that exists
here.  Nor has anyone suggested any other appropriate
reason that might allow us to depart from the original
meaning of the statute at hand.

  That, we think, holds the key to the case.  To many law-
yerly ears today, the term "contracts of employment" might
call to mind only agreements between employers and em-
ployees (or what the common law sometimes called masters
and servants).  Suggestively, at least one recently published
law dictionary defines the word "employment" to mean "the
relationship between master and servant."  Black's Law
Dictionary 641 (10th ed. 2014).  But this modern intuition
isn't easily squared with evidence of the term's meaning at
the time of the Act's adoption in 1925.  At that time, a "con-
tract of employment" usually meant nothing more than an
agreement to perform work.  As a result, most people then
would have understood §1 to exclude not only agreements
between employers and employees but also agreements that
require independent contractors to perform work.

  What's the evidence to support this conclusion?  It turns
out that in 1925 the term "contract of employment" wasn't
defined in any of the (many) popular or legal dictionaries

the parties cite to us. And surely that's a first hint the phrase wasn't then a term of art bearing some specialized meaning. It turns out, too, that the dictionaries of the era consistently afforded the word "employment" a broad construction, broader than may be often found in dictionaries today. Back then, dictionaries tended to treat "employment" more or less as a synonym for "work." Nor did they distinguish between different kinds of work or workers: All work was treated as employment, whether or not the common law criteria for a master-servant relationship happened to be satisfied.[1]

What the dictionaries suggest, legal authorities confirm. This Court's early 20th-century cases used the phrase "contract of employment" to describe work agreements involving independent contractors.[2] Many state court cases did the same.[3] So did a variety of federal statutes.[4] And state stat-

---

[1] See, *e.g.*, 3 J. Murray, A New English Dictionary on Historical Principles 130 (1891) (defining "employment" as, among other things, "[t]he action or process of employing; the state of being employed. The service (of a person). That on which (one) is employed; business; occupation; a special errand or commission. A person's regular occupation or business; a trade or profession"); 3 The Century Dictionary and Cyclopedia 1904 (1914) (defining "employment" as "[w]ork or business of any kind"); W. Harris, Webster's New International Dictionary 718 (1st ed. 1909) (listing "work" as a synonym for "employment"); Webster's Collegiate Dictionary 329 (3d ed. 1916) (same); Black's Law Dictionary 422 (2d ed. 1910) ("an engagement or rendering services" for oneself or another); 3 Oxford English Dictionary 130 (1933) ("[t]hat on which (one) is employed; business; occupation; a special errand or commission").

[2] See, *e.g.*, *Watkins* v. *Sedberry*, 261 U. S. 571, 575 (1923) (agreement between trustee and attorney to recover bankrupt's property); *Owen* v. *Dudley & Michener*, 217 U. S. 488, 494 (1910) (agreement between Indian tribe and attorneys to pursue claims).

[3] See, *e.g.*, *Lindsay* v. *McCaslin (Two Cases)*, 123 Me. 197, 200, 122 A. 412, 413 (1923) ("When the contract of employment has been reduced to writing, the question whether the person employed was an independent contractor or merely a servant is determined by the court as a matter of law"); *Tankersley* v. *Webster*, 116 Okla. 208, 210, 243 P.

utes too.[5]  We see here no evidence that a "contract of em-
ployment" necessarily signaled a formal employer-employee
or master-servant relationship.

More confirmation yet comes from a neighboring term
in the statutory text.  Recall that the Act excludes from
its coverage "contracts of employment of . . . any . . . class
of *workers* engaged in foreign or interstate commerce."  9
U. S. C. §1 (emphasis added).  Notice Congress didn't use
the word "employees" or "servants," the natural choices if

───────────

745, 747 (1925) ("[T]he contract of employment between Tankersley
and Casey was admitted in evidence without objections, and we think
conclusively shows that Casey was an independent contractor");
*Waldron* v. *Garland Pocahontas Coal Co.*, 89 W. Va. 426, 427, 109
S. E. 729 (1921) (syllabus) ("Whether a person performing work for
another is an independent contractor depends upon a consideration of
the contract of employment, the nature of the business, the circum-
stances under which the contract was made and the work was done");
see also App. to Brief for Respondent 1a–12a (citing additional
examples).

[4] See, *e.g.*, Act of Mar. 19, 1924, ch. 70, §5, 43 Stat. 28 (limiting
payment of fees to attorneys "employed" by the Cherokee Tribe to
litigate claims against the United States to those "stipulated in the
contract of employment"); Act of June 7, 1924, ch. 300, §§2, 5, 43 Stat.
537–538 (providing same for Choctaw and Chickasaw Tribes); Act of
Aug. 24, 1921, ch. 89, 42 Stat. 192 (providing that no funds may be
used to compensate "any attorney, regular or special, for the United
States Shipping Board or the United States Shipping Board Emer-
gency Fleet Corporation unless the contract of employment has been
approved by the Attorney General of the United States").  See also
App. to Brief for Respondent 13a (citing additional examples).

[5] See, *e.g.*, Act of Mar. 10, 1909, ch. 70, §1, 1909 Kan. Sess. Laws
p. 121 (referring to "contracts of employment of auditors, accountants,
engineers, attorneys, counselors and architects for any special pur-
pose"); Act of Mar. 4, 1909, ch. 4, §4, 1909 Okla. Sess. Laws p. 118
("Should the amount of the attorney's fee be agreed upon in the
contract of employment, then such attorney's lien and cause of action
against such adverse party shall be for the amount so agreed upon");
Act of Mar. 4, 1924, ch. 88, §1, 1924 Va. Acts ch. 91 (allowing exten-
sion of "contracts of employment" between the state and contractors
with respect to the labor of prisoners); App. to Brief for Respondent
14a–15a (citing additional examples).

the term "contracts of employment" addressed them alone. Instead, Congress spoke of "workers," a term that everyone agrees easily embraces independent contractors. That word choice may not mean everything, but it does supply further evidence still that Congress used the term "contracts of employment" in a broad sense to capture any contract for the performance of *work* by *workers*.

### B

What does New Prime have to say about the case building against it? Mainly, it seeks to shift the debate from the term "contracts of employment" to the word "employee." Today, the company emphasizes, the law often distinguishes between employees and independent contractors. Employees are generally understood as those who work "in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary, at 639. Meanwhile, independent contractors are sometimes described as those "entrusted to undertake a specific project but who [are] left free to do the assigned work and to choose the method for accomplishing it." *Id.*, at 888. New Prime argues that, by 1925, the words "employee" and "independent contractor" had already assumed these distinct meanings.[6] And given that, the company contends, the phrase "contracts of *employment*" should be understood to refer only to relationships between *employers and employees.*

Unsurprisingly, Mr. Oliveira disagrees. He replies that, while the term "employment" dates back many centuries, the word "employee" only made its first appearance in English in the 1800s. See Oxford English Dictionary (3d ed., Mar. 2014), www.oed.com/view/Entry/61374 (all In-

---

[6]See, *e.g.*, *Atlantic Transp. Co.* v. *Coneys*, 82 F. 177, 178 (CA2 1897); *Nyback* v. *Champagne Lumber Co.*, 109 F. 732, 741 (CA7 1901).

ternet materials as last visited Jan. 9, 2019).  At that
time, the word from which it derived, "employ," simply
meant to "apply (a thing) to some definite purpose."  3 J.
Murray, A New English Dictionary on Historical Princi-
ples 129 (1891).  And even in 1910, Black's Law Dictionary
reported that the term "employee" had only "become
somewhat naturalized in our language."  Black's Law
Dictionary 421 (2d ed. 1910).

    Still, the parties do share some common ground.  They
agree that the word "employee" eventually came into wide
circulation and came to denote those who work for a wage
at the direction of another.  They agree, too, that all this
came to pass in part because the word "employee" didn't
suffer from the same "historical baggage" of the older
common law term "servant," and because it proved useful
when drafting legislation to regulate burgeoning indus-
tries and their labor forces in the early 20th century.[7]  The
parties even agree that the development of the term "em-
ployee" may have come to influence and narrow our un-
derstanding of the word "employment" in comparatively
recent years and may be why today it might signify to
some a "relationship between master and servant."[8]

———————

    [7] See Carlson, Why the Law Still Can't Tell an Employee When It
Sees One and How It Ought To Stop Trying, 22 Berkeley J. Emp. &
Lab. L. 295, 309 (2001) (discussing the "historical baggage" of the term
"servant"); Broden, General Rules Determining the Employment
Relationship Under Social Security Laws: After Twenty Years an
Unsolved Problem, 33 Temp. L. Q. 307, 327 (1960) (describing use of
the term "employer-employee," in contradistinction to "master-servant,"
in the Social Security laws).  Legislators searched to find a term that
fully encompassed the broad protections they sought to provide and
considered an "assortment of vague and uncertain terms," including
"'servant,' . . . 'employee,' . . . 'workman,' 'laborer,' 'wage earner,' 'opera-
tive,' or 'hireling.'"  Carlson, 22 Berkeley J. Emp. & Lab. L., at 308.
Eventually "'employee' prevailed, if only by default, and the choice was
confirmed by the next wave of protective legislation—workers' compen-
sation laws in the early years of the Twentieth Century."  Id., at 309.
    [8] Black's Law Dictionary 641 (10th ed. 2014); see also P. Durkin, Re-

Opinion of the Court

But if the parties' extended etymological debate persuades us of anything, it is that care is called for. The words "employee" and "employment" may share a common root and an intertwined history. But they also developed at different times and in at least some different ways. The only question in this case concerns the meaning of the term "contracts of *employment*" in 1925. And, whatever the word "employee" may have meant at that time, and however it may have later influenced the meaning of "employment," the evidence before us remains that, as dominantly understood in 1925, a contract of *employment* did not necessarily imply the existence of an employer-employee or master-servant relationship.

When New Prime finally turns its attention to the term in dispute, it directs us to *Coppage* v. *Kansas*, 236 U. S. 1, 13 (1915). There and in other cases like it, New Prime notes, courts sometimes used the phrase "contracts of employment" to describe what today we'd recognize as agreements between employers and employees. But this proves little. No one doubts that employer-employee agreements to perform work qualified as "contracts of employment" in 1925—and documenting that fact does nothing to negate the possibility that "contracts of employment" *also* embraced agreements by independent contractors to perform work. Coming a bit closer to the mark, New Prime eventually cites a handful of early 20th-century legal materials that seem to use the term "contracts of employment" to refer *exclusively* to employer-employee agreements.[9] But from the record amassed

―――――――

lease Notes: The Changes in Empathy, Employ, and Empire (Mar. 13, 2014) ("Over time" the meaning of several employ-related words have "reflect[ed] changes in the world of work" and their meaning "shows an increasingly marked narrowing"), online at https://public.oed.com/blog/march-2014-update-release-notes/.

[9]See, *e.g.*, 1 T. Conyngton, Business Law: A Working Manual of Every-day Law 302–303 (2d ed. 1920); *Newland* v. *Bear*, 218 App. Div.

before us, these authorities appear to represent at most the vanguard, not the main body, of contemporaneous usage.

New Prime's effort to explain away the statute's suggestive use of the term "worker" proves no more compelling. The company reminds us that the statute excludes "contracts of employment" for "seamen" and "railroad employees" as well as other transportation workers. And because "seamen" and "railroad employees" included *only* employees in 1925, the company reasons, we should understand "any other class of workers engaged in . . . interstate commerce" to bear a similar construction. But this argument rests on a precarious premise. At the time of the Act's passage, shipboard surgeons who tended injured sailors were considered "seamen" though they likely served in an independent contractor capacity.[10] Even the term "railroad employees" may have swept more broadly at the time of the Act's passage than might seem obvious today. In 1922, for example, the Railroad Labor Board interpreted the word "employee" in the Transportation Act of 1920 to refer to anyone "engaged in the customary work directly contributory to the operation of the railroads."[11] And the Erdman Act, a statute enacted to address disruptive railroad strikes at the end of the 19th century, seems to evince an equally broad understanding of "railroad

——————

308, 309, 218 N. Y. S. 81, 81–82 (1926); *Anderson* v. *State Indus. Accident Comm'n*, 107 Ore. 304, 311–312, 215 P. 582, 583, 585 (1923); N. Dosker, Manual of Compensation Law: State and Federal 8 (1917).

[10] See, *e.g.*, *The Sea Lark*, 14 F. 2d 201 (WD Wash. 1926); *The Buena Ventura*, 243 F. 797, 799 (SDNY 1916); *Holt* v. *Cummings*, 102 Pa. 212, 215 (1883); *Allan* v. *State S. S. Co.*, 132 N. Y. 91, 99, 30 N. E. 482, 485 (1892) ("The work which the physician does after the vessel starts on the voyage is his and not the ship owner's").

[11] Transportation Act of 1920, §§304, 307, 41 Stat. 456; *Railway Employees' Dept., A. F. of L.* v. *Indiana Harbor Belt R. Co.*, Decision No. 982, 3 R. L. B. 332, 337 (1922).

employees."[12]

Unable to squeeze more from the statute's text, New Prime is left to appeal to its policy. This Court has said that Congress adopted the Arbitration Act in an effort to counteract judicial hostility to arbitration and establish "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 24 (1983). To abide that policy, New Prime suggests, we must order arbitration according to the terms of the parties' agreement. But often and by design it is "hard-fought compromise[]," not cold logic, that supplies the solvent needed for a bill to survive the legislative process. *Board of Governors, FRS* v. *Dimension Financial Corp.*, 474 U. S. 361, 374 (1986). If courts felt free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal, we would risk failing to "tak[e] . . . account of" legislative compromises essential to a law's passage and, in that way, thwart rather than honor "the effectuation of congressional intent." *Ibid.* By respecting the qualifications of §1 today, we "respect the limits up to which Congress was prepared" to go when adopting the Arbitration Act. *United States* v. *Sisson*, 399 U. S. 267, 298 (1970).

Finally, and stretching in a different direction entirely, New Prime invites us to look beyond the Act. Even if the statute doesn't supply judges with the power to compel arbitration in this case, the company says we should order it anyway because courts always enjoy the inherent au-

---

[12]The Act provided for arbitration between railroads and workers, and defined "employees" as "all persons actually engaged in any capacity in train operation or train service of any description." Act of June 1, 1898, ch. 370, 30 Stat. 424. The Act also specified that the railroads would "be responsible for the acts and defaults of such employees in the same manner and to the same extent as if . . . said employees [were] directly employed by it." *Id.*, at 425. See Dempsey, Transportation: A Legal History, 30 Transp. L. J. 235, 273 (2003).

Opinion of the Court

thority to stay litigation in favor of an alternative dispute resolution mechanism of the parties' choosing.  That, though, is an argument we decline to tangle with.  The courts below did not address it and we granted certiorari only to resolve existing confusion about the application of the Arbitration Act, not to explore other potential avenues for reaching a destination it does not.

\*

When Congress enacted the Arbitration Act in 1925, the term "contracts of employment" referred to agreements to perform work.  No less than those who came before him, Mr. Oliveira is entitled to the benefit of that same understanding today.  Accordingly, his agreement with New Prime falls within §1's exception, the court of appeals was correct that it lacked authority under the Act to order arbitration, and the judgment is

*Affirmed.*

JUSTICE KAVANAUGH took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–340

_____

## NEW PRIME INC., PETITIONER *v.* DOMINIC OLIVEIRA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[January 15, 2019]

JUSTICE GINSBURG, concurring.

"[W]ords generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *Ante*, at 6 (quoting *Wisconsin Central Ltd.* v. *United States*, 585 U. S. ___, ___ (2018) (slip op., at 9)). The Court so reaffirms, and I agree. Looking to the period of enactment to gauge statutory meaning ordinarily fosters fidelity to the "regime . . . Congress established." *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 234 (1994).

Congress, however, may design legislation to govern changing times and circumstances. See, *e.g.*, *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. ___, ___ (2015) (slip op., at 14) ("Congress . . . intended [the Sherman Antitrust Act's] reference to 'restraint of trade' to have 'changing content,' and authorized courts to oversee the term's 'dynamic potential.'" (quoting *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 731–732 (1988)); *SEC* v. *Zandford*, 535 U. S. 813, 819 (2002) (In enacting the Securities Exchange Act, "Congress sought to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* . . . . Consequently, . . . the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." (internal quotation marks and paragraph break omitted)); *H. J. Inc.* v.

*Northwestern Bell Telephone Co.*, 492 U. S. 229, 243 (1989) ("The limits of the relationship and continuity concepts that combine to define a [Racketeer Influenced and Corrupt Organizations] pattern . . . cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists. The development of these concepts must await future cases . . . ."). As these illustrations suggest, sometimes, "[w]ords in statutes can enlarge or contract their scope as other changes, in law or in the world, require their application to new instances or make old applications anachronistic." *West* v. *Gibson*, 527 U. S. 212, 218 (1999).